IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt)

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Clifford Cornelius Wong and Adebessi | * | Case No. 15-19543 |
| Charles Wong | * | |
| | * | Chapter 13 |
| Debtors | * | |
| * * * * * * * * * * * * * * * * * | * | * * * * * * * * * * * * * * * * * * |
| RES-FL Four, LLC | * | |
| | * | |
| Movant, | * | |
| | * | |
| v. | * | |
| | * | |
| Clifford Cornelius Wong and Adebessi | * | |
| Charles Wong | * | |
| | * | |
| and | * | |
| | * | |
| Nancy Spencer Grigsby, | * | |
| Trustee | * | |
| | * | |
| Respondents. | * | |
| * * * * * * * * * * * * * * * * * | * | * * * * * * * * * * * * * * * * * * |

**RES-FL FOUR, LLC'S MOTION TO DISMISS CASE WITH PREJUDICE**

RES-FL Four, LLC (the "Noteholder"), by its undersigned counsel, and pursuant to 11 U.S.C. §§ 1307; 105; and 109, moves this Court to dismiss the case filed by Clifford Cornelius Wong and Adebessi Charles Wong (together, the "Debtors") with prejudice. In support of its motion, the Noteholder states as follows:

**JURISDICTION AND VENUE**

1.  The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334(b).

2.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3. Venue of this case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein is Sections 1307; 105(a), and 109(g) of Title 11 of the United States Code (the "Bankruptcy Code").

## BACKGROUND

5. On April 11, 2011, the Noteholder's predecessor commenced a case against the Debtors in the Circuit Court of the Twentieth Judicial Circuit, in and for Lee County, Florida (the "Florida Court") captioned *Multibank 2009-1 RES-ADC Venture, LLC v. Adebessi Charles Wong and Clifford Wong*, Case No. 11CA051116 (the "Florida Action"). The Florida Action began as an action to foreclose upon certain investment property (the "Florida Property") previously owned by the Debtors.

6. On November 30, 2011, the Noteholder's predecessor in interest purchased the Florida Property at a foreclosure sale.

7. On January 2, 2013, after being substituted in as Plaintiff in the Florida Action, the Noteholder filed a motion to collect the deficiency owed after the foreclosure of the Florida Property.

8. While the Florida Case proceeded apace, on or about December 15, 2014, the Debtors purchased a single family home commonly known as 15208 Baileys Lane, Silver Spring, MD 20906 (the "Maryland Property"). The purchase price for the Maryland Property was $535,000.00, of which Debtors financed $525,309.00. The Debtors obtained the "down payment" for the Maryland Property by, upon information and belief, taking loans from their respective retirement accounts.

9. On February 9, 2015, the Florida Court entered judgment in favor of the Noteholder and against the Debtors in the amount of $249,285.46 plus post judgment interest (the "Judgment"). Upon the entry of the Judgment, and at present, the Noteholder was, and remains, the Debtors' largest unsecured creditor.

- 3 -

10. On July 8, 2015 (the "Petition Date"), a mere 7 months after purchasing a house for more than ½ million dollars with virtually nothing down and only 5 months after the entry of the Judgment, the Debtors' commenced the instant case by filing a voluntary petition under Chapter 7 of the Bankruptcy Code. The filing was a blatant attempt to discharge the Judgment while keeping the Maryland Property.

11. At a lengthy meeting of creditors it appeared that the Debtors theoretically had sufficient income to pay some of their debts if they made certain adjustments to their lifestyle. Subsequently, on September 29, 2015, the Debtors' filed a Motion to Convert Case to Chapter 13 [Dkt. 18]. The Court granted the Debtors' request on September 30, 2015 and Nancy Spencer Grigsby (the "Trustee") was appointed Chapter 13 Trustee of the Debtors' estate.

12. As set forth in the Noteholder's Proof of Claim No. 6, as of the Petition Date, the Noteholder has an unsecured claim of $259,945.10, which claim accounts for roughly 93% of all unsecured claims in the Debtors' estate.

13. According to the Debtors' most recently amended Schedule I [Dkt. 43] ("Schedule I"), the Debtors are relatively affluent with a combined gross monthly income of $14,715.07. Even after reducing this by the Debtors' payroll deductions, their combined net monthly income is still $9,853.30.

14. Each of the Debtors have "TSP Loan" listed as a payroll deduction in the cumulative amount of $651.93. These deductions are, upon information and belief, directed toward the repayment of the Debtors' retirement accounts for the money withdrawn to provide a down payment for the Maryland Property.

15. Schedule I further provides that the Debtors monthly payments on the Maryland Property total $3,550.50 (the "Monthly Mortgage").

16. On October 24, 2015, the Debtors filed their first Chapter 13 Plan [Dkt. 30] (the "First Plan"). The Debtors initially proposed to make plan payments of $150.00 per month for months for a grand total of $9000.00. That is, the Debtors proposed to pay less than a single

month of their net monthly income over a five year period in full satisfaction of unsecured claims of nearly $300,000.00.

17. After some encouragement from the Trustee, the Debtors agreed to amend their First Plan and, on February 3, 2016, the Debtors filed their Amended Chapter 13 Plan [Dkt. 39] (the "Second Plan"). By way of their Second Plan, the Debtors proposed to pay $150.00 per month for months 1-48 and $400.00 per month for months 49-60.

18. The Second Plan was still far from adequate, and was denied with leave to amend by order dated April 14, 2016 [Dkt. 40].

19. On May 9, 2016, the Debtors filed their Second Amended Chapter 13 Plan [Dkt. 42] (the "Third Plan"). By way of their Third Plan, the Debtors proposed to pay $150 for months 1-10, $250.00 per month for months 11-48, and $400 per month for months 49-60.

20. At this point it was clear that the Debtors' incremental increases to their plan payments were never going to reach acceptability. As a result, the Trustee filed an Objection to the Third Plan [Dkt. 44] on June 1, 2016 arguing that the Debtors had failed to file a plan in good faith as demonstrated by unreasonable monthly expenses, the fact that the Debtors have not provided that all of their projected disposable income will go towards plan payments, and the fact that the Debtors' Mortgage Payments account for a large percentage of the Debtors monthly income.

21. The Noteholder filed its own Objection to the Third Plan [Dkt. 45] arguing, *inter alia*, that the Debtors' have refused, and continue to refuse, to reduce their exorbitant monthly expenses to free up cash to pay their unsecured creditors.

22. The Debtors' Third Plan was denied confirmation by order dated June 9, 2016. A month later, the Debtors' tried yet again and filed their Third Amended Chapter 13 Plan [Dkt. 48] (the "Fourth Plan"). By way of their Fourth Plan, the Debtors propose to pay $150 for months 1-10, $250.00 per month for months 11-36, $400 per month for months 37-48, and $750.00 per month for months 49-60.

23. Under the Fourth Plan, the Debtors propose to pay roughly 8% of the total unsecured claims in their estate of $279,844.31 over a five year period which comes out to pro-rated plan payments of $373.33 per month. At the same time, the Debtors intend to continue: (1) paying their monthly Mortgage Payments of nearly TEN times their pro-rated plan payments; and (2) paying themselves back nearly TWICE the amount of their pro-rated plan payments to cover the loans withdrawn from their retirement accounts. This is simply unacceptable.

## ARGUMENT

24. Chapter 13 of the Bankruptcy Code is designed to protect not only the debtor, but creditors as well. *In re Crawford*, 324 F.3d 539 (7th Cir. 2003). Indeed, "[t]he hallmark of a Chapter 13 case is the Congressionally imposed bargain between the debtors and the debtor's creditors whereby the debtor is allowed to keep pre-petition property in exchange a future stream of payments to the debtor's pre-petition creditors." *In re McNeely,* 366 B.R. 542, 548 (Bkrtcy. N.D.W.Va. 2007).

25. Accordingly, Section 1307(c) of the Bankruptcy Code accommodates situations where this bargain is broken by providing that, "on request of a party in interest . . . the court may convert . . . or may dismiss [a Chapter 13 case] . . . for cause" and sets forth a "nonexclusive list of ten causes justifying that relief." *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 372-3 (2007).

26. The enumerated causes for dismissal include, "unreasonable delay by the debtor that is prejudicial to creditors." 11 U.S.C. § 1307(c)(1). Motions to dismiss under Section 1307(c)(1) are appropriate in situations where, as here, debtors have filed numerous plans but are unable to confirm any of them. *In re Moroney*, 330 B.R. 527, 531 (Bkrtcy. E.D.Va. 2005); *see also In re Soppick*, 516, B.R. 733, 747-8 (Bkrtcy. E.D.Pa. 2014)("[T]here is no legitimate purpose for a debtor to remain in a chapter 13 if the debtor, after given fair opportunity to do so, has been unable to propose a chapter 13 plan that can meet the confirmation requirements.")

27. In addition, while not listed as grounds under Section 1307, a lack of "good faith" provides an alternative and additional basis for dismissal. *In re Moroney*, 330 B.R. 527 at 531.

Generally speaking, the question of whether a chapter 13 case should be dismissed because it was not filed in good faith involves the same analysis governing whether a chapter 13 plan is proposed in good faith under Section 1325(a)(3) of the Bankruptcy Code. *See Matter of Belt*, 97 B.R. 962, fn.3 (Bkrtcy. N.D. Indiana 1989)("Under § 1307's express language, a petition is to be rejected for the same reasons that a plan would not be confirmed, including the lack of good faith"); *see also In re Bucco*, 205 B.R. 323,324 (Bkrtcy. M.D Fla. 1996).

28. Put another way, a Chapter 13 case should be dismissed where a plan cannot be confirmed for lack of good faith. This is the situation here.

29. The Fourth Circuit employs a "totality of circumstances" test to determine good faith, or the lack thereof. *Neufeld v. Freeman*, 794 F.2d 149, 152 (4th Cir. 1986). The "object of [this] inquiry is to determine whether or not . . . there has been an abuse of the provisions, purpose, or spirit of Chapter 13 in the proposal of the plan." *Id.* A pivotal factor of this inquiry is the proposed percentage of payment to unsecured creditors. *See Deans v. O'Donnell*, 692 F. 2d 968, 972 (4th Cir. 1982).

30. In order to determine whether chapter 13 debtors propose to repay a sufficient percentage to unsecured creditors, courts must necessarily consider the debtors' means. However, determining debtors' means for the purpose of a "good faith" analysis does not begin and end with a review of the debtors schedules, but also involves a consideration of the reasonableness of the debtors expenses, and whether the debtors should adjust their lifestyles to free up more money for plan payments. Indeed, "[d]ebtors do not have an entitlement, at the expense of their creditors, to maintain their pre-petition lifestyle." *In re Daniel*, 260 B.R. 763, 769 (Bkrtcy. E.D.Va. 2001).

31. Several Courts have tackled the question of how to treat situations where, as here, debtors desire to retain valuable property while at the same time propose to pay unsecured creditors only a fraction of their claims. The Bankruptcy Court for the Western District of Pennsylvania determined a plan was un-confirmable for lack of good faith where the debtor proposed to retain an expensive house while only paying unsecured creditors 11% of their

claims. *In re Leone*, 292 B.R. 243, 245 (Bkrtcy. W.D. Pa. 2003). The *Leone* court concluded that "[t]he Debtors have an ability to make significant distributions to unsecured creditors . . . **[a] good faith effort would require that [the] Debtors find replacement housing for themselves at a [lesser] cost** . . . [because the Debtors] should bear the cost of the unusual and improvident expenses which unfairly discriminate against unsecured creditors." *Id.* at 245(emphasis added). Similarly, the United States District Court for the District of Delaware held that debtors who proposed to retain a newly and "imprudent[ly]" purchased home while paying only 13% of unsecured creditors' claims and similarly concluding that to act in "good faith" the debtors would have to make adjustments instead of keeping their home at the expense of their unsecured creditors. *In re Rice*, 72 B.R. 311, 312 (D.Ct.De. 1987).

32. In the same vein, giving preferential treatment to the repayment of the Debtors' retirement plan loans by paying them in full while only paying the other unsecured creditors' 8 cents on the dollar, is also objectionable. *See e.g. In re Loper*, 367, B.R. 660, 667-8 (Bkrtcy. D. Colo. 2007) (rejecting repayment of retirement loan as a reasonable and necessary expense).

33. The Debtor's propose to retain the Maryland Property and pay back their retirement loan in full while only paying 8% of their unsecured claims. This is not a plan made in good faith and is even more inequitable than the plans rejected by the *Leone* and *Rice* courts. Moreover, this patently bad faith proposal is the absolute best the Debtors have come up with in four tries over nearly a year! There is no evidence that the Debtors will ever be able to propose a plan in good faith because they are unwilling to consider a plan that involves: (a) replacing the Maryland Property with a home they can afford; and/or (b) prioritizing repaying their creditors over repaying themselves.

34. In addition, good faith is also absent in cases where a "debtor files bankruptcy – not out of necessity – but for the purpose of thwarting a single creditor." *In re Delbrugge*, 347 B.R. 536, 540 (Bkrtcy. N.D.W.Va. 2006). The fact that the Debtors' purchased the Maryland Property with virtually nothing down and filed bankruptcy several months later <u>despite</u> knowing that they owed a considerable sum to the Noteholder is no coincidence. It seems clear that the

Debtors intentionally dedicated a huge percentage of their income to the Maryland Property so that they could file for bankruptcy protection and leave the Noteholder out in the cold.  This is all the more evident when one considers that the Debtors initially filed under Chapter 7 in an attempt to wipe out the Noteholder's claim entirely.   As such, there was no reason for this bankruptcy other than the Debtors intention to eliminate the Noteholder's claim, and this alone is not a legitimate bankruptcy reason.  *See e.g. In re Haque*, 334, B.R. 486, 490 (Bkrtyc. D. Mass.2005) (Plan not confirmable where sole purpose of case was to avoid payment of single debt.)

35.     Considering the foregoing, unless the Debtors' make massive adjustments which, so far, they have been unwilling to make, they will never be able to file a Chapter 13 Plan in "good faith."  Therefore, this case is nothing but an interminable and prejudicial delay to the Debtors' creditors.  Moreover, the entire character of this case has been tainted by the Debtors' singular and improper reason for filing, namely to avoid the Noteholder's claim and otherwise maintain the status quo, which similarly militates in favor of dismissal.  For the foregoing reasons, cause for dismissal exists under Section 1307(c) of the Bankruptcy Code.

36.     Additionally, an unqualified dismissal of the Debtors' bankruptcy case will not preclude the Debtors from further abusing the bankruptcy process.  The circumstances require dismissal with prejudice.

37.     Pursuant to 11 U.S.C. § 105(a), made applicable to Chapter 13 cases by 11 U.S.C. § 103(a), a Bankruptcy Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and may take "any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."  *See e.g. In re Robertson*, 206 B.R. 826, 830 (Bkrtcy. E.D.Va. 1996) (Section 105 of the Bankruptcy Code allows bankruptcy courts the right to grant prejudicial dismissals in the exercise of its equitable powers.)

38. Furthermore, as the Fourth Circuit observed in *In re Tomlin,* 105 F.3d 933 (4th Cir. 1997), 11 U.S.C. § 109(g) affords a bankruptcy court authority to temporarily ban a debtor from filing additional petitions for a period of 180 days. *In re Tomlin*, 105 F.3d at 937.

39. It seems evident that in the event of any dismissal, the Debtors will simply re-file in another attempt to discharge the Noteholder's claim and avoid domestication, and subsequent execution, of, and on, the Judgment in Maryland. Accordingly, the Noteholder requests the Court dismiss this case with prejudice and enjoin the Debtors from re-filing under any title for at least six (6) months following dismissal, with leave from the Court for the Noteholder to request additional time depending on the circumstances.

**WHEREFORE**, RES-FL Four, LLC respectfully requests this Court enter an order dismissing this case with prejudice, enjoining the Debtors from filing another bankruptcy petition under any title for a period of six (6) months, with leave from the Court for the Noteholder to request additional time depending on the circumstances, and granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 9, 2016

s/ Joshua D. Bradley_____
Joshua D. Bradley (ID 28821)
Rosenberg Martin Greenberg LLP
25 South Charles Street, 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
Fax: (410) 727-1115
E-Mail: jbradley@rosenbergmartin.com

*Attorneys for RES-FL FOUR, LLC*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, that on this 9th day of August 2016, a copy of the foregoing Motion to Dismiss, was served on the following persons, via ECF and/or first class U.S. mail, postage prepaid.

| | |
|---|---|
| US Trustee<br>US Trustee – Greenbelt<br>6305 Ivy Lane, Suite 600<br>Greenbelt, Maryland  20770 | Robert K. Goren<br>Goren & Tucci, LLC<br>177 Kentlands Blvd<br>Suite 200<br>Gaithersburg, MD 20878 |
| Nancy Spencer Grigsby<br>185 Admiral Cochrane Drive<br>Suite 240<br>Annapolis, MD 21401 | Rebecca A. Herr<br>185 Admiral Cochrane Drive<br>Suite 240<br>Annapolis, MD 21401 |

　　　　　　　　　　　　　　　　　　　　/s/ Joshua D. Bradley
　　　　　　　　　　　　　　　　　　　　Joshua D. Bradley

ND: 4839-0439-9926, v.  1